## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **KEISHA DESHON GLOVER,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. CIV-07-282-M** |
| | ) | |
| **MILLICENT NEWTON-EMBRY,[1]** | ) | |
| | ) | |
| **Respondent.** | ) | |

## <u>REPORT AND RECOMMENDATION</u>

Petitioner, a state prisoner appearing pro se, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, together with a brief in support of her petition [Doc. No. 3], challenging her conviction of second degree murder in the District Court of Oklahoma County, Case No. CF-2001-3615, for which she is serving a sentence of life imprisonment. The matter has been referred to the undersigned Magistrate Judge for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B) and (C). Respondent has filed a response to the petition [Doc. No. 9] and the state court record which includes state court competency trial transcripts ("C.Tr"), trial transcripts ("Tr.") and the original record ("O.R."). Petitioner has neither filed a reply nor sought an extension of time in which to do so. Thus, the matter is at issue. For the reasons set forth below, it is recommended that the petition be denied.

---

[1]In response to the petition, Respondent Newton-Embry asserts that Justin Jones, Director of the Oklahoma Department of Corrections ("DOC"), also identified as a respondent, is not a proper party. The undersigned agrees and recommends that Justin Jones be dismissed as a party respondent. Rule 2, Rules Governing Section 2254 Cases in the United States District Courts.

**Background**

On June 20, 2001, firemen, responding to a 911 call from Petitioner, entered her apartment and observed a man lying on the floor of the hallway with a severe knife injury to his upper left chest. The firemen and other medical emergency responders were unable to revive the victim, identified as Petitioner's husband, Phillip Davis. Petitioner advised police officers that she and Davis had begun arguing, that Davis got a knife and moved toward her, that the two struggled for the knife, and that she gained control of the knife. According to Petitioner, as she held the knife up against her chest, Davis rushed toward her and "ran up on the knife," resulting in an accidental injury.

Petitioner was charged with first degree murder in Oklahoma County District Court, Case No. CF-2001-3615. A jury found Petitioner guilty as charged and recommended a sentence of life imprisonment. O.R. Vol. 1, p. 75. Prior to formal sentencing, defense counsel moved for a continuance of the sentencing and filed an application for determination of competency based in part on counsel's discovery that Petitioner had attended special education classes in the Oklahoma City Public School system. O.R. Vol. I, pp. 110-13, 118-19, 137-42. That motion for continuance was granted by the trial court, and a competency evaluation was ordered. O.R. Vol. I, pp. 120-21, 144-45. Counsel subsequently moved for a new trial based on newly discovered evidence. *Id.*, pp. 146-158. On March 4, 2003, the trial court conducted a post evaluation competency hearing, determined that Petitioner was competent to stand trial, granted the motion for new trial, and ordered the criminal proceedings to resume. O.R. Vol. II, pp. 312-13 and Transcript of Motion for New Trial

2

Proceedings dated March 4, 2003, p. 58.

On November 17, 2003, the trial court granted defense counsel's motion for a second competency evaluation.  O.R. Vol. II, pp. 354-59.  Following that evaluation, a jury trial on the issue of her competency was held at Petitioner's request, and the jury found that Petitioner was not incompetent to undergo further criminal proceedings.  O.R. Vol. III, p. 447.  A second criminal trial was conducted in October 2004, and the jury found Petitioner guilty of the lesser included offense of second degree murder and recommended a sentence of life imprisonment with the possibility of parole.  O.R. Vol. III, p. 530.  The trial court sentenced Petitioner in accordance with the jury's recommended punishment.  O.R. Vol. IV, pp. 623-25.

On direct appeal Petitioner raised eight grounds for relief, based on alleged errors arising out of both the competency trial and the second criminal trial.  Response, Ex. 1.  The Oklahoma Court of Criminal Appeals ("OCCA") affirmed Petitioner's conviction and sentence in a summary opinion.  Response, Ex. 5.  The OCCA denied Petitioner's subsequent petition for rehearing.  Response, Exs. 2 and 5.  Petitioner states that she has filed no applications for post-conviction relief.  Petition, p. 7.

**Petitioner's Claims**

In her habeas petition Petitioner asserts the eight claims which she raised on direct appeal:

> 1.  Errors and procedural irregularities in Petitioner's competency trial deprived her of both procedural and substantive due process.

2.  The instructions given to Petitioner's competency jury did not adequately explain the criteria for a finding of incompetence as it related solely to mental retardation.

3.  The improper admission of other crimes evidence under Okla. Stat. tit. 12, § 2404(B) denied Petitioner a fair trial.

4.  The State's reliance on testimonial hearsay to introduce evidence of other crimes without the requisite showing under *Crawford v. Washington*, resulted in a violation of Petitioner's rights under the Confrontation Clause.

5.  Police officers who gave expert testimony regarding the veracity of Petitioner's defense exceeded the scope of permissible opinion evidence under the Oklahoma Evidence Code and denied Petitioner a fair trial.

6.  Reversible error occurred when the State was allowed to re-create the crime scene without the proper foundation or instruction in violation of Petitioner's fundamental right to a fair trial under the federal and state constitution.

7.  Under the circumstances of this case a life sentence is excessive under the federal and state constitution and requires a modification.

8.  Trial errors, when considered in a cumulative fashion, warrant a new trial or sentence modification.

Respondent contends that Petitioner is not entitled to habeas corpus relief under 28

U.S.C. § 2254(d).

## **Standard Governing Habeas Corpus Review**

Where, as in this case, Petitioner's claims have been adjudicated on the merits in state

court, this Court may grant habeas corpus relief only if that adjudication (1) resulted in a

decision that was contrary to, or involved an unreasonable application of, clearly established

federal law, as determined by the Supreme Court, or (2) resulted in a decision that was based

on an unreasonable determination of the facts in light of evidence presented in the State court

proceeding.  28 U.S.C. § 2254(d)(1) and (2).  Under this standard, judicial review is directed to the result of the state appellate court's decision, not its reasoning.  *See Gipson v. Jordan*, 376 F.3d 1193, 1197 (10th Cir. 2004) ("[W]e defer to the [state court's] decision unless we conclude that its result - not its rationale - is 'legally or factually unreasonable'").

A state court decision is "contrary to" clearly established federal law for purposes of § 2254 if "the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or if "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from" the result reached by the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 405-406 (2000).  It is not enough that the state court decided an issue contrary to a lower federal court's conception of how the rule should be applied; rather, the state court decision must be "substantially different from the relevant precedent of [the Supreme Court]."  *Id.*

A state court decision involves an "unreasonable application" of federal law if "the state court identifies the correct governing legal principle from [Supreme Court] decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  "AEDPA's conception of objective unreasonableness lies 'somewhere between clearly erroneous and unreasonable to all reasonable jurists.'"  *House v. Hatch*, 527 F.3d 1010, 1019 (10th Cir. 2008) (quoting *Maynard v. Boone*, 468 F.3d 665, 670 (10th Cir. 2006)), *cert. denied*, 129 S.Ct 1345 (2009).  "Thus, 'only the most serious misapplications of Supreme Court precedent will be a basis for relief under § 2254.'"  *Id.* (quoting *Maynard*, 468 F.3d at 671)).  In conducting this deferential inquiry, the Court presumes that the state court factual findings

are correct, and the burden of rebutting this presumption by clear and convincing evidence is placed on the petitioner.  *See* 28 U.S.C. § 2254(e)(1); *Smith v. Mullin*, 379 F.3d 919, 924-25 (10th Cir. 2004).

## ANALYSIS

### I. Competency Trial

#### A. Summary of Evidence

At the competency trial held in April 2004, Petitioner called five witnesses – the attorney who represented Petitioner at her first criminal trial, three medical experts and Petitioner's grandmother.  Janet Cox, Petitioner's attorney at the criminal trial in 2002, testified that during her representation of Petitioner in earlier "proceedings" and "hearings"[2] there was no indication from the available records or from her contact with Petitioner or her family that Petitioner should be evaluated for competency.[3]  C.Tr. Vol. 2, pp. 18-20.   Ms. Cox testified that Petitioner could "always relate the facts of what happened." *Id.*, p. 20.  Ms. Cox also testified that because she thought Petitioner was "slow" and "there were some things that she didn't understand," she spent extra time with Petitioner explaining, but she had noticed that Petitioner didn't ask questions.  *Id.*  According to Ms. Cox, she had "bonded" with Petitioner and "mistook her not asking me any question[s] for total trust in my

---

[2]At a hearing conducted prior to the competency trial, the court ordered counsel to admonish all witnesses to refer to prior criminal proceedings including the trial as "hearings."  C.Tr. Vol. 1, pp. 101-02.

[3]Ms. Cox explained that based on the information she had at the time of trial - Petitioner had a 12th grade education; she had a job; she was able to function around the house - there was no indication "that there was anything wrong with [Petitioner]."  C.Tr. Vol. 2, p. 25.

representation of her." *Id.*, p. 24.

After Ms. Cox learned "through a report generated by the court" that Petitioner had been in special education classes in public school,[4] *id.*, p. 21, she scheduled evaluations of Petitioner by Dr. Eugene Reynolds and Dr. Edith King, *id.*, p. 23.   Ms. Cox testified that when she received a report from Dr. King that Petitioner was not competent to effectively assist her counsel, she (Ms. Cox) put "two and two together" and realized "why [Petitioner] never asked any questions" and why the only response Petitioner ever gave was to ask when she could go home.   *Id.*   Ms. Cox testified that if she had known Petitioner's low mental abilities, she would not have put her on the stand to testify in the "prior proceeding."   *Id.*, p. 27.   Ms. Cox opined that Petitioner would never be able to understand the legal process, would never understand the difference between first degree murder and an accident, and would always believe that the stabbing was an accident.   *Id.*, p. 41.

Dr. Reynolds, a clinical psychologist, testified that in November of 2002 he conducted a psychological evaluation of Petitioner for the purpose of an intellectual assessment.   C.Tr. Vol. 1, pp. 38-39.   After administering the Wechsler Abbreviated Scale of Intelligence test, he determined that Petitioner, age 29 at the time, had an overall full-scale functioning I.Q. of 50, which placed her in the moderately retarded range of intelligence.   *Id.*, pp. 45, 51.   He further testified that Petitioner did not seem to comprehend relatively simple concepts.   *Id.*, p. 52.   Dr. Reynolds testified that he did not detect malingering; however, he did not evaluate

---

[4]That information was included in the presentence investigation report.

Petitioner for malingering and was not aware of a test for malingering in the context of an intellectual assessment.  *Id.*, pp. 52-53.  Dr. Reynolds did not evaluate Petitioner's competency and was unable to offer an opinion on that subject, *id.,* p. 61; however, he testified that in his 2002 report he recommended that Petitioner's competency be evaluated based on her low I.Q. score, her third grade third month reading ability, her history of special education classes, her lack of knowledge generally, and lack of specific understanding of the charges against her and why she was in jail.  *Id.*, pp. 50-51.

Dr. King, a clinical and forensic psychologist with specialized training in competency evaluation, testified that at the request of Petitioner's counsel, she conducted a competency evaluation of Petitioner on January 14 and 27, 2003, and met with Petitioner once again in March of 2003, to assess the possibility of mental retardation.  C.Tr. Vol. 1, pp. 68-71; C.Tr. Vol. 2, p. 5.  Dr. King administered a Wechsler adult intelligence test and concluded that Petitioner had an I.Q. of 63, which placed her in the mildly retarded range. C.Tr. Vol. 1, p. 84.  Dr. King explained that Petitioner presented a "mixed picture" and that while she initially thought Petitioner was incompetent, she later viewed Petitioner as competent. C. Tr. Vol. 2, p. 11.  Dr. King confirmed that in a hearing held on March 4, 2003, she had testified that Petitioner had at that time gained competency to stand trial.  C.Tr. Vol. 2, pp. 9-10.  Dr. King admitted, however, that she was unable to give an opinion as to whether Petitioner was competent at the time of the competency trial in 2004.  C.Tr. Vol. 1, p. 92; C.Tr. Vol. 2, p. 9.  Although she had not administered a test for malingering, Dr. King testified that she did not believe Petitioner was feigning incompetence or malingering.  C.Tr. Vol. 1, pp. 83-85.

8

Petitioner also called Dr. Roland Palmer, a psychologist specializing in developmental disabilities such as mental retardation and autism. C.Tr. Vol. 2, 59. Dr. Palmer testified that on February 26, 2003, he conducted a court-ordered psychological evaluation to assess Petitioner for the presence of a disability and for competency. *Id.*, pp. 59-61. Dr. Palmer described the various tests he administered to Petitioner during a seven hour session[5] and testified that Petitioner had a full scale I.Q. of 63. *Id.*, p. 65   According to Dr. Palmer although Petitioner had a low level of intellectual functioning and a limited vocabulary, she exhibited a high level of adaptive behavior and skills, and he therefore assessed her as low normal or borderline mentally retarded. *Id.*, pp. 64-72; 88.  With respect to her competency to stand trial, Dr. Palmer determined that although Petitioner was able to appreciate the nature of the charge against her, she was not competent at that time to rationally assist her attorney in preparation of a defense given her limited abilities and her lack of understanding of the different roles of the judge and the jury.  *Id.*, pp. 75, 91.  Dr. Palmer also concluded that with one-on-one training regarding the trial process, Petitioner could "very likely be trained to competency." *Id.*, pp. 77-79, 89.  Dr. Palmer detected no evidence of malingering. *Id.*, pp. 84-86.  At the time of the competency trial, over one year after his examination, Dr. Palmer was unable to testify as to Petitioner's present competence to stand trial. *Id.*, p. 94.

---

[5]Palmer testified that he administered the Wechsler Adult Intelligence Scale, the Vineland Adaptive Behavioral Assessment (to diagnose mental retardation), a picture vocabulary test, a mental health screen using the Psychopathy Inventory for Mentally Retarded Adults, the CAST-MR to measure competency, and then he conducted a structured competency interview. C. Tr. Vol. 2, p. 61.

The State called three witnesses: Dr. Shawn Roberson, Petitioner, and Linda Butler, a DOC Probation/Parole officer.  Dr. Roberson, a forensic psychologist at the Oklahoma Forensic Center (formerly Eastern State Hospital), testified that on December 19, 2003, approximately four months before the competency trial, he conducted a court-ordered competency examination of Petitioner for over two hours and concluded that Petitioner was competent to proceed to trial.  C.Tr. Vol. II, p. 178.   Dr. Roberson explained that he had reviewed the reports made by Drs. Reynolds and Palmer and reviewed Petitioner's medical records, which contained no record of mental illness.  Dr. Roberson testified that during his examination Petitioner claimed she didn't know anything about legal procedures; she didn't know her attorney's name; she didn't remember ever being in court before; she didn't know what she was accused of doing; and she further claimed that her husband was still alive.  *Id.*, pp. 191-92.  Petitioner was unable to provide other basic information to Dr. Roberson which she had provided to her prior examiners, such as the current year, where she was currently staying, her date of birth, her daughter's age, and her address.  *Id.*, p. 193.  Dr. Roberson testified that he administered a Test of Memory Malingering, on which even individuals with severe cognitive damage or dementia are able to perform well.  *Id.*, p. 195.  Dr. Roberson testified that Petitioner was uncooperative and that he discontinued the test because although it typically takes thirty minutes to complete all one hundred fifty items, Petitioner took approximately twenty-five minutes to complete the first eighteen items, of which she answered fifteen incorrectly.  *Id.*, p. 196.  Dr. Roberson concluded that "there was no substantive evidence that she suffered from any kind of cognitive deficit or mental illness

10

that would preclude her competency," and that Petitioner was "malingering or feigning symptoms." *Id.*, pp. 187, 199.

Linda Butler, a DOC probation/parole officer who had observed Petitioner's testimony earlier in the trial, testified that when she conducted an interview with Petitioner at the Oklahoma County jail on October 25, 2002, Petitioner had answered questions with ease, as compared to Petitioner's responses during at the competency trial. *Id.*, p. 53-54. According to Ms. Butler, during the 2002 interview, Petitioner "gave [] specific answers," was "very vocal," gave "quick answers," and "answered every question [] asked [] with no problem at all." *Id.*, p. 54. Ms. Butler described Petitioner's detailed verbal answers to questions about her residence, her education, her mental health and employment history. *Id.*, pp. 54-56. Ms. Butler also testified about Petitioner's plans for employment ("to go back to school to be a teacher"), her plans for a residence ("to stay in Oklahoma City with her family. I have an apartment on NW 122nd"), and her plans for education ("I plan to go to school to be a teacher"). According to Ms. Butler, Petitioner also wrote a letter in Ms. Butler's presence to a state court judge. Ms. Butler read the letter in which Petitioner explained that she would like to be home with her autistic daughter, complained that there were witnesses who were not called on her behalf that would have helped during the hearing, asked the judge to reduce her charges, and advised that she "plan[ned] to go back to school to be a teacher for special ed kids." *Id.*, p. 58.

## B.  Ground One - Due Process Violations

In her first claim, Petitioner alleges, as she did on direct appeal, that certain "errors

and procedural irregularities" in her competence trial "deprived her of both procedural and substantive due process."  Petition, p. 6.  Petitioner focuses on the following four alleged errors:  (1) the State improperly informed the competency jury of the nature of the charges against her and suggested that a finding of incompetence would hinder the murder prosecution; (2) the State improperly argued that Petitioner was faking mental retardation to avoid prosecution; (3) the introduction of Petitioner's videotaped statement to police was more prejudicial than probative; and (4) the trial court improperly limited the testimony of defense expert witnesses Drs. Reynolds and King regarding Petitioner's mental retardation. Petition, p. 6; *see also* Petitioner's Brief, pp. 9-13.[6]  Petitioner asserts that these "irregularities" resulted in a fundamentally unfair and unreliable proceeding, and that therefore,  "there is a substantial chance that Petitioner was tried while incompetent in her criminal trial."  Petitioner's Brief, p. 7-8 (citing *Cooper v. Oklahoma*, 517 U.S. 348 (1996)).[7] Respondent contends that the claims in Ground One involve only evidentiary issues which are matters of state law not proper for habeas review, citing *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).  Response, pp. 4-5.  In any event, Respondent asserts that the challenged evidentiary rulings did not render Petitioner's competency trial fundamentally unfair.  *Id.*,

---

[6]Petitioner's Brief in support of her petition [Doc. No 3] is an almost verbatim version of her brief on direct appeal.

[7]To the extent Petitioner attempts to allege a violation of her due process rights under the Oklahoma Constitution, such claim does not state a cognizable claim for habeas relief.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.").

pp. 6-13.

In reviewing Petitioner's competency claim on direct appeal, the OCCA concluded that "no errors or procedural irregularities" in Petitioner's competency trial deprived her of due process. Response, Ex. 4, p. 2. The OCCA found that "[t]he claims raised are heavy on the allegations, but exceedingly light on legal authority or factual support." *Id.* The OCCA also denied Petitioner's petition for rehearing, in which she argued that the OCCA had failed to give full consideration to her competency claim. Response, Ex. 5.

"Competency claims can raise issues of both substantive and procedural due process." *Walker v. Att'y Gen.,* 167 F.3d 1339, 1343 (10th Cir. 1999). Although separate and distinct, such claims can overlap." *Barnett v. Hargett*, 174 F.3d 1128, 1133 (10th Cir. 1999). A procedural competency claim arises from "a trial court's alleged failure to hold a competency hearing, or an adequate competency hearing . . . ." *McGregor v. Gibson*, 248 F.3d 946, 952 (10th Cir. 2001)(citing *Walker*, 167 F.3d at 1343). "[A] substantive competency claim is founded on the allegation that an individual was tried and convicted while, in fact, incompetent." *Id.* at 1343-44. Petitioner appears to assert violations of both her procedural and substantive due process rights. "Since the procedural competency principle operates as a safeguard to ensure that the substantive competency principle is not violated," Petitioner's procedural claim has been addressed first. *Soper v. Shanks*, No. 98-2292, 1999 WL 669206, * 2 (10th Cir. Aug. 26,1999) (unpublished)[8] (citing *Vogt v. United*

---

[8]This unpublished decision and any others cited herein are cited as persuasive authority
(continued...)

*States*, 88 F.3d 587, 591 (8th Cir. 1996)).

### 1.  <u>Procedural Due Process</u>

"A competency claim based upon procedural due process involves a defendant's constitutional right, once a bona fide doubt has been raised as to competency, to an adequate state procedure to insure that [she] is in fact competent to stand trial."  *Barnett v. Hargett*, 174 F.3d at 1133-34 (citing *Walker,* 167 F.3d at 1345).  *See also Drope v. Missouri*, 420 U.S. 162, 180-81 (1975) (a state's "failure to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives him of his due process right to a fair trial") (citing *Pate v. Robinson*, 383 U.S. 375 (1966)).  Petitioner received a post-evaluation competency trial before a jury; she claims, however, that the procedure was inadequate.  For the reasons set forth hereafter, the undersigned finds no violation of Petitioner's procedural due process rights.

In support of this claim, Petitioner first alleges that the State improperly informed the competency jury that she was charged with first degree murder.  Petitioner asserts that "[a]lthough the fact that the person whose competency is at issue is charged with a crime [might] be admissible to explain to the jury the purpose of the proceedings, the nature of the charged crime is not."  Petitioner's Brief, p. 9.  Citing Oklahoma law regarding admissibility of evidence generally, Petitioner contends that the nature of the charge was irrelevant and thus such information was improperly put before the jury.  *Id.*, p. 10.  Petitioner also claims

---

[8](...continued)
pursuant to Tenth Circuit Rule 32.1.

that any relevance identification of the pending charge might have had was outweighed by the prejudice and confusion created by "giving the jury the impression that finding Petitioner incompetent would hinder the State's ability to prosecute her for first degree murder . . . ."

Contrary to Petitioner's claim, the fact that the jury was advised of the charge against Petitioner was not a violation of state law.  *See Lambert v. State,* 888 P.2d 494, 502 (Okla. Crim. App. 1994)("The jury's knowledge of the charge is essential in determining if the defendant has the present mental capacity to appreciate the nature of the charges against him.").  In fact, using the standard state jury instruction, the court instructed the jury that the purpose of the competency trial was to determine whether Petitioner was competent to face pending criminal proceedings. O.R.. Vol. III, p. 467 (Instruction No. 1)(OUJI CR-11-1) ("This trial has been held for you to determine several issues relating to her competency so that her capacity *to stand trial in the criminal case can be decided*.")(italics added). Petitioner does not explain how providing the jury with such accurate information was unconstitutionally prejudicial or confusing.  Thus, Petitioner fails to demonstrate that she was denied a constitutionally adequate competency hearing based on this claim.

Petitioner also contends she was denied a fair competency trial based on the State's claim that she was faking mental retardation in order to avoid prosecution.  Petitioner's Brief, p. 10.  Petitioner does not deny that the State's theory that she was malingering was based on the expert testimony of Dr. Robert Shawn Roberson regarding his administration of a malingering test.  Rather, Petitioner argues that Dr. Roberson's opinion was inadequate to support the malingering theory because he did not evaluate Petitioner for mental retardation.

15

*Id.* She also asserts that by claiming she was malingering, the State in essence improperly called her a liar, and that given the procedural history of the case, the malingering theory mislead the jury. *Id.*, p. 11. None of these arguments is persuasive.

No objection was raised at trial or on appeal regarding Dr. Roberson's qualifications and expertise as a forensic psychologist, nor was any objection or claim of error raised with respect to the validity of Dr. Roberson's testing methods. Dr. Roberson's opinions regarding Petitioner's competency, including his conclusion that she was malingering, were clearly admissible as relevant and probative on the issue before the jury. *See Cooper v. Oklahoma*, 517 U.S. 348, 365 n.21 (1996) (noting that "[u]nder *Jackson* [*v. Indiana*, 406 U.S. 715 (1972)], if the defendant . . . is found to be malingering, the State may proceed to trial."); *see also Medina*, 505 U.S. at 454 (O'Connor, J., concurring) ("The main concern of the prosecution, of course, is that a defendant will feign incompetence in order to avoid trial."). Although Petitioner disagreed with Dr. Roberson's conclusion that she was malingering, her objection that such conclusion was misleading and improper is without merit. Thus, Petitioner fails to demonstrate that the evidence of her malingering violated her right to due process.

Petitioner also claims a due process violation based on the admission at her competency trial of a videotape of Petitioner's statements to police. Petitioner's Brief, p. 11. Specifically, she asserts that such evidence was more prejudicial than probative. The undersigned disagrees.

The record reflects that the State called Petitioner to testify at the competency

proceeding.  Upon initial questioning by the prosecutor, Petitioner claimed an inability to provide certain information, such as her address on the date of the incident, her telephone number, and the name of the school where she had been employed.  C.Tr.Vol. II, pp. 244-46. Approximately five minutes of a videotaped interview between Petitioner and a police detective on the date of the stabbing was played in court, which apparently showed Petitioner answering similar question without hesitation.  When asked about the difference, Petitioner explained that it had been a long time since the police interview.  C.Tr. Vol. II, p. 258.

The undersigned finds that the video was clearly relevant to the issue of Petitioner's competence. Specifically, given the State's evidence that Petitioner was faking incompetence and Petitioner's evidence of her mental retardation, the video provided an opportunity for the jury to compare her demeanor and ability to communicate at the time of her husband's death with the demeanor and communication skills she displayed during the competency trial. *Lambert*, 888 P.2d at 499; *Cooper*, 517 U.S. at 365 n.21.  Even assuming the evidence was more prejudicial than probative, Petitioner has not shown that admission of the video violated her right to due process by rendering her trial fundamentally unfair.

Finally, Petitioner claims that her due process rights were violated when the trial court improperly limited the testimony of  Petitioner's expert witnesses, Dr. Reynolds and Dr. King.  Specifically, Petitioner asserts that "[b]y divorcing the issue of mental retardation and its interference in Petitioner's ability to communicate from the competency issue, the court prevented [Petitioner] from explaining the basis of [her] incompetence claim."  Petitioner's Brief, p. 12.  Petitioner does not, however, identify any specific evidentiary rulings to which

she objects.  And a review of the record reflects that both Drs. Reynolds and King were allowed to offer testimony regarding the level of Petitioner's intellectual functioning.  C.Tr. Vol. 2, pp. 51, 84.  Moreover, the record supports Respondent's claim that many of the court's evidentiary rulings regarding the testimony of these experts were proper, due to lack of relevance and non-responsive or speculative answers.  *See e.g.*, C.Tr. Vol. 1, pp. 46-48, 79, 81-85.  Having reviewed the record, the undersigned finds that Petitioner has failed to demonstrate that she was denied a fundamentally fair competency trial based on limitations imposed on the testimony of Dr. Reynolds and Dr. King.

In sum, the undersigned finds that Petitioner received a full, fair and adequate hearing in the form of a jury trial to determine her competency to proceed to trial.  Thus, the state court's determination that "no errors or procedural irregularities" in the competency trial deprived Petitioner of due process was neither contrary to nor an unreasonable application of clearly established federal law, and Petitioner is not entitled to habeas relief based on her procedural due process claim.

### 2.  <u>Substantive Due Process</u>

Petitioner's allegation as part of her claims in Ground One that she "might" have gone to trial while incompetent attempts to raise a substantive due process claim.  *See Smith v. Mullin*, 379 F.3d 919, 932 (10th Cir. 2004)("In order to state a valid substantive due process claim, [Petitioner] must show 'he was, in fact, tried and convicted while mentally incompetent.'")(quoting *Walker v. Att'y Gen.,* 228 F.3d at 1229).  "It is well settled that the criminal trial of an incompetent defendant violates due process."  *Cooper v. Oklahoma,* 116

S.Ct. 1373 (1996)(citing *Medina v. California*, 505 U.S. 437 (1992)).  "The standard for competence to stand trial is whether the defendant has 'sufficient present ability to consult with his lawyer to a reasonable degree of rational understanding' and has 'a rational as well as factual understanding of the proceedings against him.'"  *Miles v. Dorsey,* 61 F.3d 1459, 1472 (10th Cir. 1995); *see also Drope v. Missouri*, 420 U.S. 162, 171 (1975)(quoting *Dusky v. U.S.*, 362 U.S. 402 (1960)).  "To prevail on a substantive due process competency claim, a petitioner must demonstrate by clear and convincing evidence a real, substantial, and legitimate doubt regarding his competence to stand trial."  *Walker v. Gibson*, 228 F.3d 1217, 1229 (10th Cir. 2000).  Because competency to stand trial has been recognized as a fact question, the state court's competency determination is presumed correct under 28 U.S.C. § 2254(e)(1), and Petitioner must rebut such finding by clear and convincing evidence of her actual incompetence in order to qualify for habeas relief.  *See Buchanan v. Lamarque*, No. 03-5151, 2005 WL 103064, *9 (10th Cir. Jan. 19, 2005)(citing *Wallace v. Ward*, 191 F.3d 1235, 1243 (10th Cir. 1999)).

Petitioner's substantive competency claim appears to be based on the alleged errors in the procedure of her competency trial which the undersigned has previously found to be without merit.  Petitioner has not offered any evidence, much less clear and convincing evidence, to rebut the jury's finding of competence to stand trial.

The evidence at the competency trial was conflicting.  Dr. Roberson, who had reviewed the prior evaluations and conducted a competency evaluation four months before trial, testified that Petitioner was competent and that she was feigning incompetence.

19

Petitioner's first trial counsel indicated concerns about Petitioner's competence although she admitted that with all of her experience as a defense counsel and all of her work with Petitioner, she had not recognized a competency issue with respect to Petitioner until after the criminal trial.  C.Tr. Vol. 2, pp. 20-21.  In any event, in spite of the fact that defense counsel "is often in the best position to determine whether a defendant's competency is question," *Bryson v. Ward*, 187 F.3d 1193, 1201 (10th Cir. 1999), "the concerns of counsel alone are insufficient to establish doubt of a defendant's competency," *id.* at 1202. Moreover, the competency trial record reflects that no medical expert who testified at the competency trial opined that Petitioner was legally incompetent at that time.  Dr. King and Dr. Palmer conducted competency evaluations in 2003, over one year before the competency trial and two years before Petitioner's criminal trial and conviction.  Although her testimony at the competency trial  was far from clear, it appears Dr. King initially, in 2003, found Petitioner incompetent; however, Dr. King testified that she had no idea whether Petitioner was competent at the time of the competency trial.  C.Tr. Vol. 1, p. 92.  Dr. Palmer evaluated Petitioner for the presence of a disability in February of 2003 and found that she did not meet the criteria for mental retardation although she was borderline.  C.Tr. Vol. 2, p. 61-72.  At the same time Dr. Palmer also evaluated Petitioner for competency to stand trial and found that she was not competent although he believed she might be able to achieve competency with training.  Like Dr. King, however, Dr. Palmer was unable to testify as to whether Petitioner was competent to proceed with a criminal trial  at the time of the competency trial. *Id.*, p. 94.

Expert testimony suggesting that Petitioner was incompetent to be tried over two years prior to Petitioner's conviction does not establish by clear and convincing evidence a real, substantial, and legitimate doubt as to Petitioner's competency at the time of her criminal trial. *See Walker v. Gibson*, 228 F.3d 1217, 1230 (10th Cir. 2000). The undersigned finds that Petitioner has not shown that the OCCA's application of the law to the jury's factual finding that she was competent to stand trial was contrary to or an unreasonable application of controlling law as determined by the Supreme Court. Accordingly, it is recommended that habeas relief be denied in Ground One.

### C. **Ground Two - Jury Instruction**

Next, Petitioner contends that an instruction given to the competency jury improperly increased her burden of showing incompetency by making "a showing of mental retardation more difficult." Petition, p. 8. As with Ground One, Respondent contends that this claim raises an issue of state law that is not proper for federal habeas review. Response, p. 14. Respondent also contends that Petitioner is not entitled to habeas relief because the challenged instruction did not render her trial fundamentally unfair *Id.*, pp. 14-16.

It is well established that the federal writ of habeas corpus reaches only convictions obtained in violation of the United States Constitution, federal laws, or treaties. *See e.g.*, *Mabry v. Johnson*, 467 U.S. 504, 507 (1984); *Pulley v. Harris*, 46 5 U.S. 37, 41 (1984). In this regard, a federal court reviewing a habeas petition may grant relief based upon an erroneous jury instruction only if the instruction "so infected the entire trial that the resulting conviction violates due process.'" *Middleton v. McNeil*, 541 U.S. 433, 437 (2004) (quoting

21

*Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (internal quotation omitted)); *see also Foster v. Ward*, 182 F.3d 1177, 1187 (10th Cir. 1999).

Petitioner acknowledges that the jury was given an instruction defining mental retardation in accordance with Oklahoma Uniform Jury Instruction ("OUJI") Criminal ("CR") 2d 11-3.[9]  Petitioner's Brief, p. 13.  However, as on direct appeal, she asserts that the jury should have been given the definition of "mentally retarded person" as set forth in the Children's Code, specifically, Okla. Stat. tit. 10, § 1408.[10]  Petition, p. 8; Petitioner's Brief, p. 13.

In rejecting this claim, the OCCA noted that because Petitioner did not object to the uniform jury instructions given, that court's review was limited to a determination as to whether plain error occurred.  Response, Ex. 4, pp. 2-3; *see also* C.Tr. Vol. 3, pp. 75-77.  The OCCA held that the uniform instructions which were given "were proper and were less strict than the statutory definition in the Children's Code" and that no plain error occurred in the

---

[9]The jury was instructed that a "mentally retarded person" is "a person who does not have the mental ability to manage herself and her affairs, and who requires supervision, control or care for her own welfare or the welfare of others or the community."  O.R. Vol. 3, p. 471 (Instruction No. 5, ¶ 4.

[10]At the time of Petitioner's trial, the Oklahoma Children's Code defined a "mentally retarded person" as:

> [A] person afflicted with mental defectiveness from birth or from an early age to such an extent that he is incapable of managing himself or his affairs, who for his own welfare or the welfare of other or of the community requires supervision, control, or care, and who is not mentally ill or of unsound mind to such an extent as to require his certification to an institution for the mentally ill.

Okla. Stat. tit. 10, § 1408(A).

trial court's instructions to the jury.  *Id.*

The instruction challenged in Ground Two does not entitle Petitioner to habeas relief. First, the OCCA's interpretation of state law with respect to the applicable definition of mental retardation is controlling in this Court.  *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.");  *Dennis v. Poppel*, 222 F.3d 1245, 1257 (10th Cir. 2000) (the federal habeas court is bound to accept the state court's construction of its state statutes).  Moreover, Petitioner does not explain how the allegedly improper definition denied her a fundamentally fair competency trial.  Petitioner's Brief, p. 13; Response, Ex. 1, pp. 21-23.  Finally, the record shows that the jury was instructed regarding the burden of proof as to competency, and the definitions of "competent or competency" and "incompetent and incompetency," all in accordance with Supreme Court law.[11]  *See Dusky, supra.*

For these reasons, Petitioner has not shown that the jury instructions given at her competency trial "'deprived [her] of fundamental rights guaranteed by the Constitution of the United States.'"  *Jackson v. Shanks*, 143 F.3d 1313, 1317 (10th Cir. 1998) (quotation

---

[11]The jury was instructed that "competent" or "competency" means "the present ability of a person arrested for or charged with a crime to understand the nature of the charges and proceedings brought against her and to effectively and rationally assist in her defense."  O.R. Vol. 3, p. 471 (Instruction No. 5, ¶1) (OUJI CR-11-3).  "Incompetent" or "incompetency" means "the any person who is not presently competent.  A person may be incompetent due to physical disability."  *Id.*, (¶2).  The jury was further instructed that Petitioner was presumed by the law to be competent and that the burden of proof was on Petitioner to prove incompetence by a preponderance of the evidence. O.R. Vol. 3, p. 470.

omitted).  Likewise, she has failed to show that the OCCA's decision is contrary to or an unreasonable application of clearly established Supreme Court jurisprudence.  Accordingly, Petitioner is not entitled to federal habeas relief concerning this claim.

## II.  Claims Related to Petitioner's Second Criminal Trial

Grounds Three through Eight raise alleged errors that occurred during the criminal trial following the jury's finding that Petitioner was competent to stand trial.  Specifically, Petitioner challenges the admission of other crimes evidence, the admission of testimonial hearsay in violation of the Confrontation Clause, the admission of impermissible expert testimony, the State's use of a re-created crime scene, imposition of an excessive sentence, and cumulative errors.

### A. Ground Three - Other Crimes Evidence

Petitioner claims that she was denied a fair trial by the improper admission of "other crimes evidence under Okla. Stat. tit. 12, § 2404(B).  Petition, p. 9.  Although she asserts that the "prejudicial effect of such evidence far outweighed its probative value," Petitioner does not identify the evidence of other bad acts purportedly admitted at trial.  *Id.*; *see also* Petitioner's Brief, pp. 13-14.  The undersigned has liberally construed the factual basis of Petitioner's claims to include the following issues raised on direct appeal:  (1) the testimony by George Kofa regarding an incident when he and Petitioner broke up after dating, and (2) the testimony of Delandria Nolan and Oklahoma City police officer Jeff Phelps regarding an incident in 1994 between Petitioner and the victim, Mr. Davis.  Response, Ex. 1, pp. 26-28. Prior to trial the State advised Petitioner that it intended to present such testimony regarding

Petitioner's prior similar violent acts, and in a hearing the State argued that the other crimes evidence was necessary to show that the stabbing was not accidental but a calculated ambush. Mot. Tr. September 30, 2004, pp. 4-5.  The trial court held that the evidence was admissible. *Id.*, p. 22.

George Kofa testified that he and Petitioner attended the same high school and had dated between 1990 and 1992.  Tr. Vol. 1, p. 50.  Kofa testified that a few months after he broke up with Petitioner, Petitioner came to his work place; they became involved in a heated argument, and she sprayed mace in his face.  Tr. Vol. 1, p. 53-54, 55, 56, 64.

Officer Jeff Phelps testified that he had been called to investigate an incident at the Jeltz Center on September 9, 1994.  Tr. Vol. 1, p. 87.  Officer Phelps interviewed a man identified as Phillip Davis who stated that after Petitioner had kicked him out of their apartment, he had begun to live with his brother at the Jeltz Center, and that on the date in question, Petitioner had arrived at his brother's apartment about 6:00 a.m. requesting food stamps, and when he opened the door, she stabbed him in the arm with a knife.  *Id.*, pp. 91-92.  Davis told Officer Phelps that Petitioner had returned to the apartment later the same morning, and when Davis answered the door, she attempted to stab him again and he slammed the door.  *Id.*, p. 92.  The two ended up in the apartment parking lot, and Petitioner reported that Davis had pulled a gun on her and that she had a minor leg injury.  *Id.*, p. 93.  Phelps testified that a knife was later discovered underneath a parking divider in the parking lot and that neither party was arrested.  *Id.*, pp. 94, 97, 101.

Delandria Nolan testified that in September of 1994 while she was property manager

at the Jeltz Center for the Oklahoma City Housing Authority, "a lady" came to her requesting that she call security.  Tr. Vol. 1, pp. 76-77.  When Nolan went outside, security and police had already arrived.  *Id.*, p. 77.  Nolan testified that she saw the woman sitting outside on a concrete parking divider and saw her place a knife up under a brick.  *Id.*, p. 78.  Although Nolan knew a man was involved in the incident, she did not know him and did not remember what he said to her.  *Id.*, p. 79.  Nolan could not identify the woman involved in the 1994 incident nor remember any further details of the incident.  *Id.*, pp. 80-81.  Although Nolan remembered talking to the police, she did not remember what she told them.  Even after reviewing her statement to the police office, Nolan was unable to remember making that statement although she testified that she believed the statements she made to law enforcement officials that day were true.  *Id.*, p. 84.

In rejecting Petitioner's claim regarding the admission of this evidence, the OCCA held that under Okla. Stat. tit. 12, § 2404(B) – Oklahoma's evidentiary rule governing the admission of prior bad acts – the trial court did not abuse its discretion because Petitioner's prior bad acts were relevant "to show motive and absence of mistake."  Response, Ex. 4, p. 3.  In Oklahoma, evidence of uncharged other crimes is admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." *Douglas v. State*, 951 P.2d 651, 673 (Okla. Crim. App. 1997); *see also* Okla. Stat. tit. 12, § 2404(B).  Also, "[e]vidence of other crimes may . . . be admissible when it is part of the res gestae of the crime charged."  *Pickens v. State*, 19 P.3d 866, 876 (Okla. Crim. App. 2001).  To qualify as part of the res gestae, the evidence must be: (1) so closely connected to the

charged offense as to form part of the entire transaction; (2) necessary to give the jury a complete understanding of the crime; or (3) central to the chain of events." *Rogers v. State*, 890 P.2d 959, 971 (Okla. Crim. App. 1995).

State court evidentiary rulings are based on questions of state law and "may not provide habeas corpus relief . . . unless [those rulings] rendered the trial so fundamentally unfair that a denial of constitutional rights results." *Duckett v. Mullin*, 306 F.3d 982, 999 (10th Cir. 2002) (internal quotations omitted); *see also Smallwood v. Gibson*, 191 F.3d 1257, 1277 (10th Cir. 1999) (applying the same standard to review a state court's decision to admit evidence of prior bad acts). Thus, to the extent Petitioner's claim in Ground Three relies solely on state law, she fails to state a cognizable claim for habeas relief. Moreover, as set forth below, the undersigned finds that the admission of the challenged prior bad acts did not render Petitioner's trial fundamentally unfair.

As the OCCA noted, evidence of the 1994 incident was relevant to establish Petitioner's motive and absence of mistake in regard to the subsequent stabbing of her husband. The two prior incidents involved Petitioner's aggressive actions when she was arguing with or in a dispute with a man. Moreover, testimony showing that Petitioner had previously been armed with a knife which she had used offensively against Mr. Davis was relevant to rebut Petitioner's claim that the stabbing incident that killed her husband was the result of an accident or self-defense. *See Cheney v. State*, 909 P.2d 74, 87 (Okla. Crim. App. 1995) (evidence of "prior altercations between spouses is relevant to the issue to show hostility, intent, motive or malice"); *Hooker v. State*, 887 P.2d 1351, 1359 (Okla. Crim. App.

27

1994) (defendant's prior attack on estranged wife was admissible); *Duvall v. State*, 825 P.2d 621, 626 (Okla. Crim. App. 1991) (ill feeling, threats, or similar conduct by one spouse toward another in a marital homicide case is admissible and relevant); *Holt v. State*, 774 P.2d 476, 478 (Okla. Crim. App. 1989) (violation of victim protective order admissible to show motive); *Lamb v. State*, 767 P.2d 887, 890 (Okla. Crim. App. 1988) (prior incidents where husband attacked wife was properly admitted in marital homicide case).

The jury was instructed on the limited purpose for which the other crimes evidence was admitted, and the jury is presumed to have followed these instructions.[12]  *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).  Further, the jury was presented with substantial evidence at trial sufficient to support the finding that Petitioner committed second degree murder.[13]  The testimony of the medical examiner included a description of Mr. Davis' injury that was inconsistent with Petitioner's testimony.  Dr. Chai Choi testified that the knife had

---

[12]The jury was instructed that:

Evidence has been received that the defendant has allegedly committed misconduct or offenses other than that charged in the Information.  You may not consider this evidence as proof of the guilt or innocence of the defendant of the specific offense charged in the Information.  This evidence has been received solely as to the issue of the defendant's alleged absence of mistake or accident.  This evidence is to be considered by you only for the limited purpose for which it was received.

O.R. Vol. 3, p. 549 (Instruction No. 15).

[13]In Oklahoma, a homicide is murder in the second degree when the homicide is "perpetrated by an act imminently dangerous to another person and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual."  Okla. Stat. tit. 21, §701.8(1).

been thrust into Davis at a downward angle of forty degrees and that the stab wound was slightly over four inches deep.  Tr. Vol. 2, pp. 58-64.  Dr. Choi further testified that Davis was a muscular man and that it would have taken violent force to drive the knife that far into his heart.  *Id.*, pp. 65, 93, 95.  Dr. Choi testified that Davis had no defensive wounds on his body.  *Id.*, p. 74.  Additionally, there was no evidence of cuts or defensive bruises on Petitioner after Davis was stabbed that would indicate a struggle over the knife as she asserted.  *Id.*, pp. 231-32, 278-79; Tr. Vol. 3, pp. 113, 117-19, 136.  And, there was no blood on Petitioner's clothing, as would be expected if Davis had run up against the knife she was holding as she claimed.  Tr. Vol. 3, p. 104.  Emergency responders arriving on the scene noted that Petitioner had made no attempt to treat Davis' wound and was calm when she stated that her husband "fell on the knife."  Tr. Vol. 1, p. 144, 177, 179.  Additionally, experienced crime scene investigators testified that there was no evidence in the apartment to support a mutual combat fight between Petitioner and Mr. Davis.  Tr. Vol. 3, pp. 54, 114.

Based on the above, the undersigned finds that the evidence admitted as to Petitioner's prior bad acts did not fatally infect the trial or deny the fundamental fairness that is the essence of due process.  The OCCA's decision regarding the admission of prior bad act evidence was neither contrary to nor an unreasonable application of Supreme Court precedent.  Accordingly, it is recommended that habeas relief be denied on Ground Three.

### B.  Ground Four - Hearsay Evidence

In Ground Four Petitioner alleges that the admission of testimonial hearsay to introduce evidence of other crimes violated *Crawford v. Washington*, 541 U.S. 36 (2004) and

her rights under the Confrontation Clause.  Petition, p. 11.  Although Petitioner refers to the testimony of Delandria Nolan and Officer Jeff Phelps in her supporting brief, Petitioner's Brief, p. 14, she does not any articulate facts supporting her Confrontation Clause claim, but simply contends that the OCCA's opinion failed to address Petitioner's challenge to the hearsay testimony through Nolan and, in considering the issue "waived" in the context of Officer Phelp's testimony, the OCCA incorrectly failed to recognize the objection to his testimony at a pretrial hearing.  *Id.*

With respect to the issue of hearsay evidence, the OCCA found that "the statements the victim, Phillip Davis, had previously made in 1994 to police – responding to and investigating a domestic disturbance between Davis and [Petitioner] – were most likely 'testimonial hearsay' that *could have* been excluded under *Crawford* . . . ."  Response, Ex. 4, p. 3.  However, noting that no objection had preserved the issue, the Court determined that no plain error occurred, reasoning that counsel's failure to object during the officer's testimony appeared "strategic as counsel cross-examined the officer at length about what was said, who said it, and what was done in response."  *Id.*[14]

The Sixth Amendment of the United States Constitution guarantees an individual accused of a criminal offense the right "to be confronted with the witnesses against him." U.S. Const. amend. VI.  In *Crawford v. Washington*, 541 U.S. 36 (2004), the United States

---

[14]In her Petition for Rehearing, Petitioner argued that the OCCA had failed to address her challenge to the admission of hearsay testimony through Delandria Nolan, which claim had been preserved by objection at trial.  Response, Ex. 2, p. 4.

Supreme Court held the Confrontation Clause bars the admission of testimonial hearsay

unless the declarant is shown to be unavailable and the defendant had an earlier opportunity

to cross-examine the declarant. *Id.* at 51-52.[15] Although the *Crawford* Court declined to give

precise definition to "testimonial" hearsay, the Court stated that, at a minimum, testimonial

hearsay includes "prior testimony at a preliminary hearing, before a grand jury, or at a formal

trial; and to police interrogations." *Crawford*, 541 U.S. at 68.

The Supreme Court provided additional guidance as to what constitutes testimonial

hearsay in *Davis v. Washington*, 547 U.S. 813, 821 (2006).[16] The *Davis* Court concluded that

"[s]tatements are nontestimonial when made in the course of police interrogation under

circumstances objectively indicating that the primary purpose of the interrogation is to enable

police assistance to meet an ongoing emergency." *Id.* A statement given under interrogation

is testimonial if "the circumstances objectively indicate that . . . the primary purpose of the

interrogation is to establish or prove past events potentially relevant to later criminal

prosecution ." *Id. See also United States v. Summers*, 414 F.3d 1287, 1302 (10th Cir. 2005)

("[A] statement is testimonial if a reasonable person in the position of the declarant "would

objectively foresee that his statement might be used in the investigation or prosecution of a

---

[15]At the time the OCCA reached its decision in Petitioner's direct appeal, the Supreme Court had decided *Crawford*. Therefore, *Crawford* governs Petitioner's Sixth Amendment claim regarding the admission of Nolan and Phelp's testimony about statements made by Davis in 1994. *See Brown v. Uphoff*, 381 F.3d 1219, 1224 n. 4 (10th Cir. 2004) ("To determine the applicable 'clearly established' law, we look to Supreme Court precedent as it existed when the state court reached its decision.").

[16]In *Davis*, the Court applied an objective test to determine whether police interrogation that took place in the course of a 911 call produced testimonial statements.

crime."); *United States v. Mendez*, 514 F.3d 1035, 1043 (10th Cir. 2008).[17]   Further, "the

[Confrontation] Clause restricts only statements meeting the traditional definition of hearsay"

which is "'a statement, other than one made by the declarant while testifying at the trial or

hearing, offered in evidence to prove the truth of the matter asserted.'" *United States v.

Faulkner*, 439 F.3d 1221, 1226 (10th Cir. 2006 ) (quoting Fed. R. Evid. 801©).

With respect to Delandria Nolan, the Confrontation Clause was not violated because

her testimony did not constitute testimonial hearsay.  Ms. Nolan's testimony did not include

any statements made by Petitioner at the apartment building in 1994.  Rather, Nolan's

testimony simply demonstrated that she did speak to law enforcement regarding an incident

in the apartment complex parking lot and that the statements she made were truthful.  Thus,

Ms. Nolan's testimony did not constitute an out of court statement offered to prove the truth

of the matter asserted.  Nor were her statements testimonial in nature under *Davis* or

*Crawford*.  Accordingly, the undersigned finds that Nolan's testimony did not violate

Petitioner's confrontation rights.

At the time Officer Phelps questioned Mr. Davis in 1994, police had been called to

investigate a domestic disturbance but there was no ongoing emergency at the time Phelps

arrived on the scene.  Therefore, the primary purpose of Phelp's questioning of Davis served

to establish past events of Petitioner's actions that could possibly have been used in later

---

[17]The Tenth Circuit has instructed that a multi-part inquiry should be employed to determine
if the right to confrontation has been violated.  *Mendez*, 514 F.3d at 1043.  The inquiry requires
examination of (1) whether the challenged evidence is hearsay; (2) whether it is testimonial; and (3)
if the evidence is testimonial hearsay, whether its introduction was harmless error.  *Id.*

criminal prosecution.  Consequently, statements made by Davis to Officer Phelps during Phelps' investigation of the 1994 domestic incident could be viewed as testimonial statements, the admission of which violated *Crawford*.  *Crawford*, 541 U.S. at 53 and n.4 (finding statements given in response to structured police questioning qualifies as testimonial).

Even if Petitioner's federal constitutional rights under the Confrontation Clause were violated as a matter of clearly established Supreme Court law by the admission of Davis' statement to the police, such error is subject to harmless error analysis.  *See, e.g., Lilly v. Virginia*, 527 U.S. 116, 140 (1999); *Coy v. Iowa*, 487 U.S. 1012, 1021-22 (1988); *Delaware v. Van Arsdall*, 475 U.S. 673, 681-84 (1986).  The "harmless beyond a reasonable doubt" standard articulated by the Supreme Court in *Chapman v. California*, 386 U.S. 18, 24 (1967), is the proper standard for state courts to apply when evaluating alleged instances of constitutional error on direct appeal.  *Saiz v. Burnett*, 296 F.3d 1008, 1012 (10th Cir. 2002).  *See also Bartell v. State*, 881 P.2d 92, 95-97 (Okla. Crim. App. 1994); *Simpson*, 876 P.2d at 701 (Okla. Crim. App.1994) (citing *Chapman, supra*).  From the OCCA's opinion and its specific citation to *Simpson*, it is not clear what harmless error standard the state appellate court applied in reaching its holding.  Assuming that the OCCA did not apply *Chapman* and did not reach the merits of Petitioner's federal due process claim, this Court exercises its "independent judgment" in deciding the claim.  *Battenfield v. Gibson*, 236 F.3d 1215, 1220 (10th Cir. 2001).

The appropriate harmless error standard to be applied on habeas review is from *Brecht*

*v. Abrahamson*, 507 U.S. 619 (1993).  *See Webber v. Scott*, 390 F.3d 1169, 1177 (10ᵗʰ Cir. 2004) (declining to apply AEDPA deference where it was unclear whether OCCA reached the merits of the petitioner's federal due process claim; conducting harmless error analysis under *Brecht*).   Under *Brecht*, federal habeas relief on the basis of trial error is not proper unless the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623;[18] *see also Stevens v. Ortiz*, 465 F.3d 1229 (10ᵗʰ Cir. 2006) (applying *Brecht* to Confrontation Clause error arising from admission of hearsay statement). If "grave doubt" exists about the harmlessness of the error, the Court must treat the error as though it had affected the verdict.  *See O'Neal v. McAninch*, 513 U.S. 432, 435 (1995); *Bland v. Sirmons*, 459 F.3d 999, 1009 (10ᵗʰ Cir. 2006) (quoting *O'Neal, supra*).

As previously discussed, substantial evidence supported the finding that Petitioner was guilty of second degree murder.  The medical examiner's testimony indicated that Davis had no defensive wounds and had been stabbed at a downward angle four inches deep. Petitioner had no defensive cuts or bruises nor was there any blood on her clothing. Moreover, the crime scene evidence at the apartment did not support a mutual combat theory. Further, Petitioner calmly informed emergency responders and police officers that her husband "fell on the knife" or "ran up" on the knife, and she had made no attempt to treat her

---

[18]Errors of the "trial type" are those which occur during presentation of the case to the jury as opposed to "structural defects" which include such deprivations as the right to be represented by counsel. In this case, the court's decision to allow admission of other crime/bad act evidence beyond that related to motive, intent and state of mind is an error of the "trial type." *See Brecht*, 507 U.S. at 629-630.

husband's knife wound.

In light of this evidence, the undersigned finds that any error in admitting Phelps' testimony regarding Davis' 1994 statements about Petitioner's physical violence did not have a substantial and injurious effect or influence in determining the jury's verdict. Consequently, Petitioner's fourth claim for habeas relief should be denied.

## C.  Ground Five - Expert Testimony

At trial, Petitioner attempted to establish that Davis' death was an accident, or alternatively, that she had acted in self-defense.  In Ground Five, Petitioner contends that the State elicited testimony from two police officers that improperly commented on the veracity and credibility of Petitioner's version of the events.  Petition, attached page following p. 16. In her supporting brief, Petitioner specifically challenges the testimony of Oklahoma City police officer Larry Spruill, who testified regarding his investigation of the crime scene, and Detective Mike Veasy, who offered his opinion that Davis' fatal knife wound was not inflicted in self defense or by accident.  Petitioner's Brief, p. 15.

With respect to Officer Spruill's statements, the following exchange took place:

(Prosecutor):  Sir, throughout your investigation were you made aware that one of [Petitioner's] version of this incident is that the victim, Phillip Davis, had a knife, was swinging it, and she was able to take it away from him?  Is that correct?

(Spruill):  Yes, sir. I am aware of the scenario.

(Prosecutor):  Now, I want to ask you the general question and then I will ask you to elaborate.  Based on the information, the physical evidence you have, you were aware of the lack of defensive wounds on both [Petitioner] and Phillip Davis, is that correct?

35

(Spruill): That's correct.

(Prosecutor):  Is that scenario that she gave to the police then plausible in your mind?

(Spruill): Based on my training and experience, no.

Tr.Vol. 2, pp. 204-05.   Spruill's subsequent testimony detailed how the evidence demonstrated an ambush rather than a mutual fight.  Tr. Vol. 2, pp. 206-52.

With respect to Detective Veasy, the prosecutor asked about the information Veasy had obtained from Officer Randy Scott regarding Petitioner's initial version of what had happened at the apartment.   The prosecutor asked Veasy, "And with respect to [Petitioner's] answers, did you believe her story?" to which Detective Veasy answered "No, I didn't." Tr.Vol. 3, pp. 113-15.

Petitioner alleges, as on direct appeal, that the admission of the detectives' testimony exceeded state law restrictions on opinion evidence and violated her due process right to a fundamentally fair trial.   Addressing this claim on direct appeal, the OCCA found the question of "whether the police officers' testimony regarding the veracity of [Petitioner's] defense exceeded the scope of permissible opinion evidence" was a "close question." Response, Ex. 4, pp. 3-4.  The Court continued:

> However, a careful review of the unobjected-to exchanges demonstrates that the police investigators were primarily commenting on the state of the physical evidence rather than on [Petitioner's] veracity.  The circumstances presented in the cited cases, *Romano v. State*, [909 P.2d 92 (Okla. Crim. App. 1995)] and *McCarty v. State*, [765 P.2d 1215 (Okla. Crim. App. 1988)] go beyond what occurred in this case and are distinguishable.  While a small portion of this challenged testimony was objectionable, in the absence of objections we find no error occurred.

36

Response, Ex. 4, p. 4.

Thus, the OCCA rejected Petitioner's evidentiary claim relying on state law.  As with her claim in Ground Three, Petitioner's reliance on an alleged violation of state law fails to show that she is entitled to federal habeas relief.  *Johnson v. Mullin*, 505 F.3d 1128, 1141-1142 (10th Cir. 2007) (noting that "'it is not the province of a federal habeas court to reexamine state court determinations on state-law questions'") (quoting *Estelle v. McGuire*, 502 U. S. 62, 67- 68 (1991)), *cert. denied*, __ U.S. __, 128 S. Ct. 2933 (2008).

Further, Petitioner fails to show that she was denied a fair trial by such challenged testimony.  As discussed in the context of Grounds Three and Four, the trial record demonstrates that the officers' opinion testimony was corroborated by the evidence, and thus their testimony did not usurp the fact-finding process of the jury.  Further, the trial court instructed the jury to give expert testimony only such weight and value as they deemed it entitled to receive.  O.R., Vol. 3, p. 556 (Instruction No. 22) (OUI CR 9-42).[19]  Under these circumstances, the undersigned finds that Petitioner has failed to show that the testimony by

---

[19]The jury was instructed:

Testimony has been introduced of certain witnesses who purport to be skilled in their line of endeavor or who possess peculiar knowledge acquired by study, observation, and practice.  You may consider the testimony of these witnesses, and give it such weight and value as you think it should have, but the weight and value to be given their testimony is for you to determine.  You are not required to surrender your own judgment to that of any person testifying, based on that person's education, training or experience.  You need not give controlling effect to the opinion of such witness for their testimony, like that of any other witness, is to be received by you and given such weight and value as you deem it is entitled to receive.

O.R., Vol. 3, p. 556.

Officers Sprawl and Easy fatally infected her trial such that she was denied her right to a fundamentally  fair trial.  Accordingly, the conclusion of the OCA was reasonable, and Petitioner is not entitled to habeas relief in Ground Five.

### D. Ground Six - Re-creation of Crime Scene

In Ground Six Petitioner alleges that her right to a fair trial was violated "when the State was allowed to re-create the crime scene without the proper foundation or instruction." Petition, attached page following p. 16.  An *in camera* hearing prior to opening statements was held to determine whether the State could set up a mock hallway to depict the hallway of the apartment where the homicide occurred for demonstrative purposes only.  Tr. Vol. 1, p. 17.  Over Petitioner's objection, the trial court allowed the use of the hallway and then instructed the jury that the wall would be used for demonstration purposes during opening statements and later during trial.  *Id.*, pp. 21-24.  On direct appeal, Petitioner argued that certain state procedural guidelines had not been followed to ensure that the mock hallway was a "correct representation of the object portrayed, relevant and not unfairly prejudicial," and further that the jury had not been given a contemporaneous limiting instruction. Response, Ex. 1, pp. 34-37.  The OCA held that the trial court did not "abuse[] her discretion in allowing the wall exhibit to be used."  Response, Ex. 4, p. 4.[20]

---

[20]In reaching this decision, the OCA relied upon *Bartell v. State*, 881 P. 2d 92, 100-01 (Okla. Crim. App. 1994) and *Huitt v. State*, 562 P.2d 873, 1137 (Okla. Crim. App. 1977), in which the Court noted its previous cases upholding demonstrations which were based on the evidence presented at trial and not theatrical demonstrations, and in which it was found that the  brief demonstrations were not so prejudicial as to outweigh the probative value of helping the jury understand the evidence.

Petitioner contends that the "admission" of the mock hallway "absent the proper guidelines and any limitation was more prejudicial than probative." Petitioner's Brief, p. 16-17 (citing Okla. Stat. tit. 12, § 2403 and *Dunkle v. State*, 139 P.3d 228 (Okla. Crim. App. 2006)).[21] When no particular constitutional guarantees are implicated, evidentiary objections raise questions merely of state law and, therefore, are cognizable in a federal habeas action only if the alleged error was so grossly prejudicial that it fatally infected the trial and denied the fundamental fairness that is the essence of due process. *Harris v. Poppell*, 411 F.3d 1189, 1197 (10th Cir. 2005); *Revilla v. Gibson*, 283 F.3d 1203, 1212 (10th Cir. 2002); *Bullock v. Carver*, 297 F.3d 1036, 1055 (10th Cir. 2002) ("Generally speaking, a state court's misapplication of its own evidentiary rules . . . . is insufficient to grant habeas relief.").

In this case, the undersigned finds that the use of the constructed hallway for demonstrative purposes did not deny Petitioner's right to due process. First, the re-created hallway, which was not admitted into evidence, did not stage a theatrical demonstration, or a video or computer re-enactment presented by an expert witness. *See Dunkle, supra*. Second, the demonstration assisted the jury in understanding the layout of the relevant areas of the crime scene, *i.e.*, the foyer and hallway of the apartment. Further, the position of Petitioner in relation to Davis was one of the key determinations to be made by the jury, and the demonstration was an attempt to clarify this issue to the jury. Additionally, both the State

---

[21]Respondent contends that Petitioner's claim pertaining to the OCA's decision in *Dunkle* is not exhausted because such claim, which was only presented to the state courts in her petition for rehearing, is not exhausted for purposes of this habeas proceeding Response, p. 26. It is not necessary to resolve this exhaustion issue, because, as argued by Respondent, the claim may be denied on the merits. 28 U.S.C. § 2254(b)(2).

and Petitioner used the hallway exhibit to elicit testimony from responding emergency personnel and police officers as to the location of physical evidence, such as the position of Davis' body and the knife, as well as the relative positions of bloodstains and arterial spurts on the hallway walls, as depicted in the crime scene photographs.

The record shows that Petitioner had an adequate opportunity to challenge the "evidentiary underpinnings" of the demonstrative wall as well as the possible inferences drawn from it, and thus its use did not result in a denial of fundamental fairness.[22] *See Harris v. Poppell*, 411 F.3d 1189, 1198 (10th Cir. 2005).  Accordingly, the undersigned finds that the OCA's rejection of this claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law, nor was it an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d)(1) and (2).  It is therefore recommended that relief be denied as to Ground Six.

---

[22]Petitioner's reliance on *Dunkle, supra*, which was decided by the OCA four days prior to the Summary Opinion in Petitioner's case, does not assist Petitioner's claim in Ground Six.  The evidentiary issue challenged in *Dunkle* was the State's use of several computer-generated animations to show that the defendant's version of a shooting was inconsistent with the evidence, which animations were allowed by the trial court, without instruction to the jury, as demonstrative aids. On appeal, the OCA concluded that "[b]ecause the animations were not fairly representative of the evidence in the case, they were not relevant." *Id.* at 251.  The Court reasoned that the victim only had one bullet wound, the bullet did not pass through any solid surface other than the victim's body, and the bullet was never found.  *Id.* at 248.  Finding that the expert "had no objective physical evidence from which to determine the position of the victim's body, at the time of the shooting, in relation to some other known point or surface," the Court found that the use of the animations was inappropriate and misleading and that the data, including physical evidence, the crime scene analysis, and defendant's incomplete and widely varying statements, did not support the computer animations. *Id.* at 249-50.

Petitioner's case did not involve the use of computer animation, and she does not argue that the hallway was not a fair and accurate representation of the evidence to which it related.  Moreover, the jury was advised that the mock hallway would be used for demonstration purposes, and it was not admitted into evidence

### E. **Ground Seven - Excessive Sentence**

In Ground Seven, Petitioner alleges that "[b]ecause of the circumstances surrounding this case, and Petitioner's personal history," her sentence of life imprisonment is "excessive under the federal and state constitution." Petition, unnumbered page following p. 16; Petitioner's Brief, p. 17. Petitioner does not and cannot claim that her sentence of life imprisonment for second degree murder is beyond the range provided by statute. *See* Okla. Stat. tit. 21, §701.9(B) (punishment for second degree murder is not less than ten years nor more than life). Rather, Petitioner claims, as on direct appeal, that her sentence is disproportionate under the Eighth Amendment. Petitioner's Brief, p. 17 (citing *Harkins v. Hargett*, 200 F.3d 1279, 1282 (10th Cir. 1999)). The OCA rejected Petitioner's challenge to the excessiveness of her sentence, finding that "[Petitioner's] life sentence, which was within the statutory range of punishment, was proper and does not require any relief." Response, Ex. 4, p. 4.

The Eighth Amendment, which forbids cruel and unusual punishments, contains a narrow proportionality principle that applies to noncapital sentences." *Ewing v. California*, 538 U.S. 11, 20 (2003) (citation and internal quotations omitted). The proportionality principle, however, "reserves a constitutional violation for only the extraordinary case." *Lockyer v. Andrade*, 538 U.S. 63, 77 (2003). *See also United States v. Gillespie*, 452 F.3d 1183, 1190-1191 (10th Cir. 2006) (summarizing Supreme Court precedent on the proportionality principle and noting that "the [Supreme] Court has only twice invalidated a sentence under the Eighth Amendment: once in 1910, when the defendant was sentenced to

41

fifteen years in chains and hard labor for falsifying a public document; and most recently in 1983, when the defendant was sentenced to life without parole after committing six nonviolent felonies including writing a bad $100-dollar check") (citations omitted).  As the Tenth Circuit has instructed, courts "are reluctant to interfere with the legislative determination of an appropriate sentence range."  *Hawkins v. Hargett*, 200 F.3d 1279, 1285 (10th Cir. 1999).  Application of the narrow proportionality principle has, therefore, been reserved to the truly extraordinary case involving a sentence grossly disproportionate to the crime of conviction.  *Hawkins v. Hargett*, 200 F.3d at 1282.  *See also United States v. Angelos*, 433 F.3d 738, 750 (10th Cir. 2006); *United States v. Gurule*, 461 F.3d 1238, 1247 (10th Cir. 2006).

In light of Supreme Court precedent on the disproportionality principle and the fact that Petitioner's sentence of life imprisonment is within the statutory range of punishment permitted under Oklahoma law, the undersigned finds that Petitioner's sentence is not grossly disproportionate to her crime.  *Compare Harmelin v. Michigan*, 501 U.S. 957, 994 (1991) (holding that a sentence of life without parole is not disproportionate to a first-time offender's conviction of possession of cocaine).  Petitioner fails to present the extraordinary case needed to establish a violation of her Eighth Amendment rights.  Habeas relief based on the claim raised in Ground Seven of the petition should be denied.

## F. **Ground Eight - Cumulative Error**

Petitioner claims that the cumulative error resulting from the claims raised in Grounds One through Seven entitles her to federal habeas relief.  Petition, attached page following p.

16.   The OCA rejected this claim, finding "no cumulative error or basis for relief." Response, Ex. 4, p. 4.

The claims raised in Grounds One through Seven of the petition have been reviewed and no error has been found meriting federal habeas relief.   In reviewing a claim of cumulative error, the court may only consider actual errors for purposes of determining whether a due process violation has occurred.   *See Le v. Mullin*, 311 F.3d 1002, 1023 (10th Cir. 2002) ("[A] cumulative error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors.") (citation omitted).   *See also Workman v. Mullin*, 342 F.3d 1100, 1116-17 (10th Cir. 2003) ("Workman's sentence cannot be unconstitutional due to cumulative error because we have not found that the district court committed error.").   Therefore, the undersigned finds that Petitioner's cumulative error claim is without merit and recommends that Ground Eight of the petition be denied.

## <u>RECOMMENDATION</u>

Based upon the foregoing analysis, it is recommended that the petition for a writ of habeas corpus be denied.   It is further recommended that Justin Jones be dismissed as a party Respondent.   Petitioner is advised of his right to file an objection to this Report and Recommendation with the Clerk of this Court by the 20th day of July, 2009, in accordance with 28 U.S.C. § 636 and Local Civil Rule 72.1.   Petitioner is further advised that failure to make timely objection to this Report and Recommendation waives his right to appellate review of both factual and legal questions contained herein.   *Moore v. United States*, 950 F.2d 656 (10th Cir. 1991).   This Report and Recommendation disposes of all issues referred

to the undersigned Magistrate Judge in the captioned matter.

ENTERED this 30th day of June, 2009.

BANA ROBERTS
UNITED STATES MAGISTRATE JUDGE